CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 2 8 2008

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| Joseph Mitchell Miller, et al., *Plaintiffs,* | CIVIL ACTION NO. 3:06cv00020 |
| v. | MEMORANDUM OPINION |
| Dogwood Valley Citizens Association, Inc., et al., *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the Court on the bench trial held on June 24, 2008, and June 25, 2008. Plaintiffs Joseph Mitchell Miller, Douglas A. Dye, Jr., and Kenneth G. Colby, Jr. are residents of Greene County, Virginia, and own parcels of real estate in the Dogwood Valley subdivision. Plaintiffs claim that Defendants Gary E. Lowe, Matthew P. Brown, Dean Musser, Keith Wynn, and Judith Frances McDavid, collectively directors of the Dogwood Valley Citizens Association, engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(b) and 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), by unlawfully filing liens, issuing warrants-in-debt, and foreclosing upon properties within the Dogwood Valley subdivision. Defendants contend that Plaintiffs have failed to provide any evidence of extortion or any other criminal acts to support their civil RICO claim. Having heard and considered the evidence, the Court will now set forth its findings of fact and conclusions of law and render its judgment thereon.

### FINDINGS OF FACT

1. Plaintiffs Joseph Mitchell Miller ("Miller"), Douglas A. Dye, Jr. ("Dye"), and Kenneth G. Colby, Jr. ("Colby") are owners of parcels of real estate in the Dogwood Valley subdivision.

2. Defendants Gary E. Lowe ("Lowe"), Matthew P. Brown ("Brown"), Keith Wynn

("Wynn"), and Judith Frances McDavid ("McDavid") also own parcels of real estate in the Dogwood Valley subdivision. Brown, Wynn, and McDavid presently reside in the subdivision.

3. Defendant Dean Musser ("Musser") owned a parcel of real estate in the Dogwood Valley subdivision and resided on that lot until he sold his residence in 2005.

4. The Dogwood Valley subdivision was created in October 1968 by the original owners of the property, Bradley K. Haynes and Betty G. Haynes (collectively the "Haynes") and Kermit Gallihugh and Barbara A. Gallihugh (collectively the "Gallihughs"). (Pls.' Ex. 1.)

> a. The Deed of Dedication provided that the roads in the subdivision described on the subdivision plats were dedicated to public use and that title to the roads would be transferred to Greene County with the condition that the roads would not be taken into the public highway system unless lot owners brought the roads to the specifications of the Virginia Department of Highways. (*Id.*)
>
> b. The Deed of Dedication established a $15.00 annual assessment to be paid per lot to fund the maintenance of the roads and common areas. (*Id.*)

5. Dye decided to cease payment of the assessment, also known as the "regular assessment" and "road fees," in 1974 because he did not believe the roads or common areas were being maintained.

6. Defendant Dogwood Valley Citizens Association, Inc. ("DVCA") was formed in November 1978 for the maintenance, preservation and architectural control of the subdivision roads, residence lots, and common facilities of the Dogwood Valley subdivision. (Pls.' Ex. 2.)

7. On December 5, 1978, the B.K. Haynes orporation transferred any rights it had in the roads and common areas in the subdivision to the DVCA, which included the right to use and maintain the roads and common facilities. (Pls.' Ex. 4.)

2

8. The DVCA filed warrants-in-debt against Dye in 1979 and recorded liens on his property to recover the $875 in delinquent assessments resulting from his decision to cease payment of the regular assessment. (Pls.' Ex. 6.)

9. The General District Court for Greene County tried the warrants-in-debt in 1984 and decided on December 19, 1984, that the DVCA had failed to establish title to the regular assessments because the fees were reserved originally for the Haynes and the Gallihughs, but were conveyed to the DVCA by only the B.K. Haynes Corporation, without a conveyance from the Haynes and Gallihughs to the B.K. Haynes Corporation. (Pls.' Ex. 10.)

10. The decision of the Greene County General District Court was appealed to the Circuit Court and later nonsuited without prejudice on July 11, 1985. (Pls.' Ex. 11.)

11. The DVCA held a regular board meeting on November 18, 1989, at the office of its then-counsel David Dickey ("Dickey"). At that meeting, Dickey advised the DVCA of the effects of the recently enacted Virginia Property Owners Association Act ("POAA"), Va. Code § 55-508 *et seq.*[1]

>  a. Dickey advised that the POAA provided "clearly establishe[d] legal authority for the Association to levy special assessments for road maintenance" and "more leeway to bring legal action against those who fail to pay their fees and/or violate the DVCA covenants." (Defs.' Ex. 3.)

---

[1] The Virginia General Assembly enacted the POAA during its 1989 Session to govern the operation of property owners' associations. The Act guarantees certain rights and protections to individual members and grants associations the right to enforce rules and regulations. The Act also grants associations the right to levy special assessments and to suspend individual members' use of facilities or services or impose and enforce liens for unpaid assessments. *See* Va. Code Ann. §§ 55-513, -514, -516. The Act applied to developments subject to a declaration recorded after January 1, 1959, and property owners' associations incorporated or otherwise organized after that date. *See* Va Code Ann. § 55-508. The Act did not apply retroactively, but did apply prospectively to all property owners' associations in existence on the effective date of the Act, July 1, 1989. *Id.*

3

b. Dickey advised the DVCA to establish a committee to discuss and implement the new authority provided by the POAA. In particular, Dickey emphasized the need to establish clearly the need for any special assessment and to prepare a list of projects that would result in improvements to the development, such as rejuvenating Walnut Lake, installing culverts, upgrading the roads, or repairing Rock Island Drive. (*Id.*)

12. Lowe, Brown, Wynn, McDavid, and Musser each have served as an officer on the board of the DVCA at one point since 1992.

13. The DVCA held a regular board meeting on September 23, 1992. The board decided unanimously that it would not levy a special assessment pursuant to its authority under the POAA unless fifty-one percent of DVCA members approved the levy. (Defs.' Ex. 4.)

14. The DVCA held a regular board meeting on September 24, 1994. The board discussed roads and culverts in need of maintenance—specifically Mica Drive and Pine Hill Drive. The board decided that culverts not maintained would be removed by the DVCA and owners would be billed for damages to the road and the cost of removal. (Defs.' Ex. 5.)

a. The board also discussed changes to the lien provisions of the POAA. The board agreed to prepare a list of delinquent assessments and place liens of the respective properties. The board also decided to begin foreclosure proceedings on delinquent properties if the liens did not prove successful. (*Id.*)

15. The DVCA held a regular board meeting on October 22, 1995. The board discussed the process to obtain emergency money from the Federal Emergency Management Agency ("FEMA") to repair roads damaged by the catastrophic floods that occurred in June 1995. (Defs.' Ex. 7.)

a. FEMA advised the DVCA that a special assessment would need to be levied on lot owners before it could disburse emergency relief funds to the DVCA. (*Id.*)

16. The DVCA notified its members of a special meeting to be held on November 18, 1995, to vote on whether to levy a special assessment on lot owners to pay for the road damage. (Defs.' Ex. 6.)

    a. The DVCA held the special meeting on November 18, 1995, with sixty-eight members physically in attendance and another twenty-nine members present by proxy. (*Id.*)

    b. The board explained that the DVCA needed to levy a special assessment to receive FEMA emergency funds and believed that it would face long term indebtedness if the special assessment levy did not pass. (*Id.*)

    c. The DVCA members decided to pass a special assessment of $100.00 per lot due by February 1, 1996, by a vote of seventy to twenty-seven. (*Id.*) This special assessment was in addition to the annual road assessments required in the deeds of declaration of $15.00 to $25.00 per lot collected by the DVCA.

    d. The board sent a notice to DVCA members on November 28, 1995, to advise them of the decision to enact a special assessment of $100.00 per lot in 1996 in addition to their regular road assessments. (*Id.*)

17. The DVCA held a regular board meeting on February 10, 1996, and decided that lots that were delinquent in paying assessments would be forwarded to an attorney for collection and those lots delinquent for more than three years would be foreclosed upon within ninety days. (Defs.' Ex. 8.)

18. The DVCA board levied a special assessment of $35.00 per lot in 1996, 1998, 1999, 2000, and 2001 to be paid the following year with the approval of a majority of DVCA members. DVCA members voted not to levy a proposed special assessment of $25.00 per lot in 1997.

5

20. Because the original deed was lost or missing, the Haynes and Gallihughs recorded a corrective deed on July 11, 1997, to convey any and all rights held in the roads and the common areas of the Dogwood Valley subdivision to the DVCA. (Defs.' Ex. 30.)

21. The DVCA held a regular board meeting on October 18, 2002, and decided to eliminate the majority approval requirement on the levying of special assessments. The board instead decided that it would vote whether to levy a special assessment and allow DVCA members to decrease or rescind the determined assessment. (Defs.' Ex. 14.)

    a. The board decided to levy a special assessment of $35.00 per lot in 2002, 2003, and 2004.

22. The DVCA sold certain delinquent lots, including two lots owned by William A. Winkelman ("Winkelman"), at auction in 1998 pursuant to Va. Code. § 55-516 due to the owners' failure to pay the 1995 regular and special assessment.

23. Winkelman subsequently challenged the sale of his Dogwood Valley lots in the Circuit Court of Greene County. The Greene County Circuit Court issued its decision on February 10, 2003, and found that the DVCA qualified as a property owners association under the Virginia POAA and that the sale of the lots was properly authorized by the DVCA, but concluded that the sale of the lots was void due to ambiguity in the statute.[2]

24. The parties appealed the decision to the Supreme Court of Virginia, which affirmed in

---

[2] Specifically, the court held that Va. Code § 55-516(I) did not authorize a property owners' association to sell lots at public auction because the statute provided for the sale of "units" and did not mention parcels or lots of real property or incorporate by reference any prior definitions that included references to real property. Thus, the POAA permitted property owners' associations to sell only "units" in a condominium association or a real estate cooperative at public based on the court's interpretation and could not sell"lots" of real property. The General Assembly modified this provision of the code in 2004 to remedy this error in drafting.

6

part and reversed in part the Greene County court's decision on January 16, 2004. The court agreed that the sale of Winkelman's lots was void, but not because of the language of the statute. Instead, the Court held that the DVCA was not a property owners' association within the meaning of Va. Code § 55-508 because the declarations establishing the DVCA did not expressly require the DVCA to maintain the common areas or the roads.[3] See Dogwood Valley Citizens Ass'n, Inc. v. Winkelman, 590 S.E.2d 358, 360–61 (Va. 2004).

25. The DVCA filed declarations from its by-laws with the Clerk of the Circuit Court of Greene County in an effort to cure the deficiency identified in the *Winkelman* decision. The declaration required the board of the DVCA to "cause the roads and common facilities to be maintained according to the extent that the funds collected permit." (Defs.' Ex. 16.)

26. The board levied a special assessment of $50.00 per lot in 2005 after it filed the corrective declaration.

27. The DVCA filed a warrant-in-debt on Miller on November 18, 2005, for $418.03 in delinquent assessments and recorded a memoranda of lien on his lots. (Pls.' Exs. 49, 52.)

28. The DVCA filed a warrant-in-debt on Colby in 2005 for $70.00 in delinquent assessments and recorded a memorandum of lien on his lot. (Pls.' Exs. 67, 68.)

28. Colby and Miller challenged the warrant-in-debt in the Circuit Court of Greene County. The court issued its decision on October 30, 2006, and held that the DVCA was not a property

---

[3]The court held that the DVCA was not a property owners' association within the meaning of the POAA because it had "failed to identify any document, recorded among the land records of the jurisdiction where some property of the development is located, that expressly requires DVCA to maintain the common areas or the roads. This duty must be <u>expressly</u> stated in the recorded documents and may not be inferred or implied." *Winkelman*, 590 S.E.2d at 361. The court noted that while the subdivision's deed of dedication and the protective covenants referenced an annual lot assessment for the use, upkeep and maintenance of the roads and other common facilities, it did not expressly require the DVCA to maintain those roads or common areas. *Id.* As a result, it did not qualify under Va. Code § 55-508. *Id.*

7

owners' association under the POAA and, therefore, lacked authority to levy special assessments under Va. Code § 55-514. *See Dogwood Valley Citizens Ass'n v. Colby* (Va. Cir. Ct. 2006).

29. The board did not levy any special assessments after the court's decision, but it did continue to levy and collect regular assessments for road maintenance, albeit designated as "road fees," as directed by the deeds of declaration. (Pls.' Ex. 46, 47, 65, 66.)

30. The parties cross-appealed the *Colby* decision of the Circuit Court of Greene County to the Supreme Court of Virginia. The Supreme Court of Virginia affirmed the decision on January 11, 2008, by rejecting the DVCA's argument that the definition of "declaration" within the POAA included such instruments as articles of incorporation or bylaws filed in the appropriate land records. The court reiterated that the responsibility for maintenance of common areas and roads must be imposed on an association and that this duty cannot be voluntarily assumed. Therefore, the court held that the DVCA did not have the duty to maintain the common areas or the roads because the declarations in the deeds of dedication of the development did not impose such a duty. *See Dogwood Valley Citizens Ass'n, Inc. v. Shifflett*, 654 S.E.2d 894, 896–97 (Va. 2008).

## CONCLUSIONS OF LAW[4]

### 1. Applicable Legal Standards

Plaintiffs claim that Defendants have injured their property by reason of a violation of 18 U.S.C. § 1962, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and, therefore, should receive threefold the damages sustained, plus the costs of suit and reasonable attorney's fees. *See* 18 U.S.C. § 1964. Civil RICO is a statutory tort remedy that allows a party to recover injuries incurred by a violation of the criminal RICO provisions. The remedy for RICO violations is severe;

---

[4]To the extent that any of the findings of fact is a conclusion of law, it should be considered as a conclusion of law. Likewise, to the extent that any of the conclusions of law is a finding of fact, it should be considered as a finding of fact.

8

thus, RICO liability extends only for "unlawful activities whose scope and persistence pose a special threat to social well-being." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (quoting *Menasco, Inv. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)).

Section 1962(b) of Title 18 makes it unlawful for a person to acquire an interest through a pattern of racketeering activity in any enterprise that affects interstate commerce. 18 U.S.C. § 1962(b). Similarly, Section 1962(c) makes it unlawful for any person employed or associated with an enterprise engaged in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, the elements common to these provisions are (1) a person, (2) an enterprise, and (3) a pattern (4) of racketeering activity (5) that causes injury to the plaintiffs. *Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 840 (E.D. Va. 2007).

Racketeering activity is defined as "any act or threat" involving specified state law crimes, such as murder, robbery, or extortion, or any "act" indictable under specified federal statutes, such as mail fraud, wire fraud, or extortion. A plaintiff claiming a violation of the Hobbs Act, 18 U.S.C. § 1951, as the predicate act in a civil RICO claim—as Plaintiffs claim—must establish that the defendants obstructed, delayed, or affected commerce by robbery or extortion. 18 U.S.C. § 1951(a). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion can be based on the fear of economic harm, and this fear "need not be the consequence of a direct or implicit threat by the defendant" so long as the "circumstances surrounding the alleged extortionate conduct rendered that fear reasonable." *United States v. Billups*, 692 F.2d 320, 330 (4th Cir. 1982). Nevertheless, extortion requires more than fear alone; the use of fear must be "wrongful" in that the defendant knew that he or she was not legally

9

entitled to the property received. *United States v. Sturm*, 870 F.2d 769, 774 (1st Cir. 1989); *see also United States v. Tobin*, 155 F.3d 636, 640 (3rd Cir. 1998) (explaining that Hobbs Act violation of fear of economic loss requires the plaintiff to prove that "the defendant did not have a legitimate claim to the thing of value that is the subject of the alleged extortionate act and that the defendant knew that he or she did not have such a claim). In short, the use of legitimate economic threats, including the threat or use of litigation, to obtain property is "wrongful" only if the defendant has no claim of right to that purpose. *Sturm*, 870 F.2d at 773; *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006) (holding that the Hobbs Act does not impose liability for the threat of litigation "where the asserted claims do not rise to the level of a sham"); *United States v. Pendergraft*, 297 F.3d 1198, 1206–08 (11th Cir. 2002) (finding that threat to file litigation, even if made in bad faith, is not "wrongful" under the Hobbs Act)

### 2. Conclusions

1. The 1984 decision of the General District Court of Greene County has no substantive effect on this case. It is well-settled that a perfected appeal of a district court decision to the circuit court "is in effect a statutory grant of a new trial, in which the perfected appeal annuls the judgment of the district court as completely as if there had been no previous trial." *Ragan v. Woodcroft Village Apartments*, 497 S.E.2d 740, 742 (Va. 1998). The fact that the parties subsequently took a nonsuit does not change this principle because "the taking of a nonsuit as to a cause of action not only 'carries down the previous rulings and orders in the case' but also 'leaves the situation as if the suit had never been filed.'" *Lewis v. Culpeper County Dep't of Soc. Servs.*, 647 S.E.2d 511, 514 (Va. Ct. App. 2007) (quoting 6A Michie's Jurisprudence, *Dismissal, Discontinuance and Nonsuit* § 30, 216 (2001)). In short, if a plaintiff that prevails in the district court takes a nonsuit in the defendant's appeal to the circuit court, "the combined effect of the principles applicable to nonsuits

10

and *de novo* appeals is to nullify the entire suit as if it had never existed in either court." *Id.*

2. Because the 1984 decision of the General District Court for Greene County has no legal effect, the DVCA continued to possess the legal authority to collect regular assessments, also known as "road fees" from that day forward. This authority still exists as no court has yet held that it does not have this authority.[5]

3. Prior to the *Winkelman* decision in 2004, the DVCA rightfully believed that it had the authority to levy special assessments on its members pursuant to the Virginia POAA. The DVCA's counsel, David Dickey, advised it in 1989 of the "clear legal authority" to levy special assessments for the maintenance of the roads and common areas and to issue liens and/or foreclose upon any properties delinquent in the payment of assessments.

4. The ability to levy the special assessments is independent and unrelated to the collection of the regular assessments, despite Plaintiffs' tendency to conflate the two.

5. The DVCA did not know that it did not have the legal authority to levy special assessments until the Supreme Court of Virginia issued the *Winkelman* decision on January 16, 2004. The *Winkelman* decision was the first instance that the DVCA learned that it was not a property owners' association under the POAA.

6. The DVCA filed declarations from its bylaws with the Clerk of the Circuit Court of Greene County in good faith and in an attempt to remedy the Supreme Court of Virginia's finding that the DVCA was not expressly required to maintain the common areas or the roads. *See Winkelman*, 590 S.E.2d at 360–61.

---

[5]This is not to say that a court would find that the DVCA does not have legal authority to collect the regular assessments or "road fees." A court may well find that the corrective deed filed on July 11, 1997, remedied any deficiencies created in the original conveyances. That issue is not before this Court, however, and it will not opine on the effect of the corrective deed.

11

7. The DVCA anticipated a legal challenge to its attempted remediation because of repeated litigation with its members over the years. For that reason, it levied a special assessment after the *Winkelman* decision only one time in the year 2005 so that it could determine whether the filed declaration had remedied the deficiency. (*See* Pls.' Exs. 64, 65, 66.) The DVCA has not levied any special assessments since 2005. (Pls.' Exs. 46, 47, 65, 66.)

8. Defendants did not learn that the attempt to remedy the deficiency failed until the Circuit Court of Greene County issued its decision on October 30, 2006. The DVCA has not levied any special assessments since this decision was issued, but has continued to collect the regular assessments for road maintenance as set forth in the original deeds of declaration.

9. At no time did the DVCA attempt to levy or collect special assessments pursuant to the Virginia POAA when it knew that it lacked the legal authority to levy such assessments.

10. The DVCA attempted to remedy the deficiency identified in *Winkelman* in good faith and also appealed the decision in *Colby* to the Supreme Court of Virginia in good faith. Therefore, the threat and use of litigation was not "wrongful" under the Hobbs Act. *See Sturm*, 870 F.2d at 773; *see also Sosa*, 437 F.3d at 939–40; *Pendergraft*, 297 F.3d at 1206–08.

11. The DVCA legitimately believed it had a claim of right to the special assessments levied in the years 1995–96 and 1998– 2005. As a result, the use of warrants in debt and liens on members' property to collect delinquent special assessments was not wrongful under the Hobbs Act. *Strum*, 870 F.2d at 774; *see also Tobin*, 155 F.3d at 640.

12. Because Plaintiffs have been unable to offer any evidence of a "wrongful" use of fear of economic harm, their claim of extortion under the Hobbs Act fails. 18 U.S.C. § 1951(b)(2); *Billups*, 692 F.2d at 330.

13. Plaintiffs have not offered any evidence of other predicate acts to establish the required

Case 3:06-cv-00020-NKM-BWC Document 96 Filed 08/28/08 Page 12 of 13 Pageid#: 1552

pattern of racketeering.[6] Accordingly, Plaintiffs have failed to prove their civil RICO claim and the Court will enter judgment in favor of Defendants.

## CONCLUSION

For the reasons stated herein, the Court will render judgment in favor of Defendants in an order to follow.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this 28th day of August, 2008

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[6]Plaintiffs initially alleged mail fraud as a predicate act, but appear to have abandoned this claim in their post-trial brief. Regardless, there is no evidence that Defendants devised or intended to devise any scheme or artifice to defraud or obtain money by false or fraudulent purposes as required by 18 U.S.C. § 1341. Instead, the evidence clearly establishes that Defendants simply tried to collect the monies necessary to maintain the roads and common areas as required by the deeds of declaration and the DVCA bylaws.